UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-20612 CIV-GOLD/MCALILEY

CONSEJO DE DEFENSA DEL ESTADO
DE LA REPUBLICA DE CHILE, on behalf
of the Republic of Chile,

      Plaintiff,

v.

PNC FINANCIAL SERVICES GROUP INC.,
and PNC BANK, N.A.,
      Defendants.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
<u>TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>**

Plaintiff, Consejo de Defensa del Estado de la República de Chile, on behalf of the Republic of Chile ("Republic of Chile"), files this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [D.E. 39].

## I.    INTRODUCTION

The Republic of Chile seeks damages from PNC Financial Services Group, Inc., ("PNC Financial") and PNC Bank, N.A., ("PNC Bank") (collectively, "PNC" or "Defendants") as successor in interest to the Riggs National Bank of Washington D.C. ("Riggs Washington") and Riggs International Banking Corporation ("Riggs Miami"), (collectively, "Riggs") because Defendants are liable for millions in damages to the Republic of Chile PNC seeks to dismiss the Second Amended Complaint because it contends that the action is either time barred or fails to meet the statutory elements for a civil RICO action.  Both arguments fail and the motion should be denied.

## II.    MEMORANDUM OF LAW

### A.    THE REAL STORY

PNC disingenuously argues that Riggs was nothing more than a simple banking institution implementing the instructions of its clients.  PNC would like for this Court to believe that it was nothing more than an innocent bystander, hoodwinked by the cunning Pinochet.  To do so, one would have to ignore the glaring truth: Riggs and its officers, both in Washington D.C. and Miami, knowingly and deliberately engaged in the management and operation of a money laundering scheme with the Pinochet Enterprise.  In order to increase the capital and stature of the bank, Riggs officials went to great lengths to court Pinochet and broke numerous U.S. banking and regulatory laws in the process of entering his inner circle of comrades.  The reality is that, together with Pinochet, Riggs looted the Chilean treasury and operated a highly

successful money laundering scheme that resulted in the Republic of Chile's loss of nearly $11 million dollars.

Riggs served as long-standing personal banker for Pinochet and actively and knowingly assisted him in the concealment and movement of funds derived from specified unlawful activity.  Riggs opened at least 28 accounts for Pinochet, his family, cohorts and other individuals and corporations under his direct control.  Riggs accepted millions of dollars in deposits from Pinochet and the Pinochet-controlled accounts without any inquiry into the source of these funds.  Riggs set up offshore shell corporations to disguise Pinochet's ownership of these accounts and even altered the names of his personal accounts to further conceal Pinochet's ownership of foreign bank accounts from Chile. Riggs studiously and consciously avoided using the name "Pinochet" in account documents and initiated "hold mail" instructions for both personal and corporate accounts.

It is the height of irony that Riggs would argue that its conduct with Pinochet is not actionable.  Riggs' conduct spawned two lengthy Senate reports directed at its money laundering activities and pled guilty to criminal conduct involving failure to comply with bank laws.  It is, in essence, the poster child for bank money laundering.  Money laundering is, of course, a specified unlawful activity for purposes of RICO.  It is difficult to imagine a more compelling case for RICO liability based on money laundering than the Riggs case.

We are dismayed that counsel for PNC would raise the earlier sending of a Rule 11 letter to predecessor counsel.  That letter was directed at the initial complaint, a pleading that has long since been withdrawn (although it was withdrawn for reasons wholly unrelated to anything in the letter).  No subsequent letters have been received and we would not expect to receive one, given the overwhelming evidence of wrongdoing by the bank.  We understand that Rule 11 letters are

confidential among counsel, and object to counsel raising it to try to gain some sort of litigation advantage here.  Further, despite PNC's aggressive rhetoric, one similarly situated bank involved in the Pinochet enterprise has already settled with the Republic of Chile.[1]  Moreover, one other bank facing similar claims by the Republic of Chile likewise took an aggressive approach and filed a Rule 11 motion.  That motion was filed at 5:30 p.m. on September 3, 2009 and denied by the court 20 minutes later, without the need for a response from the Republic of Chile.  We expect that, because counsel for these banks are in close communication, the court's off-hand denial of the Rule 11 motion in the other case has counseled Riggs' counsel from making a similar motion.  Nonetheless, we categorically deny making any litigation decisions in this case based on the Rule 11 letter, and ask that the Court disregard the reference in this motion.

**B.      THE INSTANT ACTION IS NOT BARRED BY THE FIVE YEAR STATUTE OF LIMITATIONS.**

Both sides agree that the statute of limitation for an action based on Fla. Stat. §772.103 is five years.  *See* Fla. Stat. Ann. § 772.17.  The parties do not agree, however, on the "trigger date" for calculating those five years.  PNC argues that the Republic of Chile should have brought this action, at the very latest, within five years after the date on which Riggs committed the last act in violation of RICO.  This assertion ignores the fact that Riggs actively concealed the existence and activity of the bank accounts in question and continued this concealment, and thus furthered the ultimate purpose of the Pinochet Enterprise, even after it had closed the Pinochet accounts.  The Republic of Chile did not have knowledge of Riggs' involvement, participation and

---

[1] On October 16, 2009, Banco de Chile agreed to pay the Republic of Chile approximately $3 million dollars in settlement of similar claims brought by the Republic of Chile in this district in *Consejo de Defensa del Estado de la Republica de Chile v. Banco de Chile,* Case No. 09-20614. *See,* http://ww3.bancochile.cl/wps/wcm/resources/file/eba41a45f45c21d/Informacion%20de%20interes%20-%20Transaccion%20CDE%20-%20Traduccion.pdf

assistance to the Pinochet Enterprise and could not have discovered the Bank's misconduct before July 15, 2004 by the exercise of due diligence because of the deceptive and fraudulent acts of both Riggs and the Pinochet Enterprise to conceal the identity and source of the funds held at the Bank.  In fact, Riggs knowingly concealed 19 of the 28 Pinochet-related accounts from federal regulators during the investigation that led to the publication of the 2004 Senate Report.  Because the Pinochet-controlled accounts were kept secret and concealed by Riggs, the Republic of Chile was unaware of Riggs' involvement in the Enterprise's misappropriation of funds from the national treasury of Chile for Pinochet's personal benefit.  As set forth below, the statute did not begin to run when the acts of the defendant prevented the Republic of Chile from discovering the actions that caused the injuries.  Indeed, the Florida law governing the operation of the statute of limitation forbids such result.

PNC is incorrect in arguing that the claims accrued when Riggs closed the last Pinochet account.  The argument ignores the injury discovery rule, which governs RICO statute of limitations claims.  Florida RICO is interpreted based on federal precedent.  "Because the Florida RICO Act is patterned after the federal act, Florida looks to federal authorities in construing its own RICO statute." *Bortell v. White Mountains Ins. Group, Ltd.,* 2 So.3d 1041, 1047 (Fla. 4th DCA 2009); *see also O'Malley v. St. Thomas University, Inc.*, 599 So.2d 999, 1000 (Fla. 3d DCA 1992).  *Rotella v. Wood,* 528 U.S. 549, 555 (2000), and its progeny, including *Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2001), establish the injury discovery rule.  Even without reference to the federal precedents, Florida courts apply the injury discovery rule to claims governed by the specific statute of limitations at issue here.  *See Sands v. Diliberto*, 546 So. 2d 455 (Fla. 3d DCA 1989); *see also, Jones v. Childers,* 18 F. 3d 899 (11th Cir. 1994).  In *Childers,* the Eleventh Circuit applied the injury discovery rule to a Florida

RICO claim. *Childers,* 18 F. 3d 899 (11th Cir. 1994). Since that decision, we have found no Florida state court case to the contrary addressing §772.103 or 772.104 construing the applicable statute of limitation provision.[2] Therefore, the *Childers* decision is binding precedent on this Court and the injury discovery rule remains viable for Florida RICO claims. Accordingly, for purposes of determining when the five year statute of limitations will begin to run, the Court should apply the injury discovery rule, so that the limitations period began to run on the date the Republic of Chile plaintiff knew it was injured. Here, the Republic of Chile did not know it was injured by Riggs until at least July 15, 2004 when the Senate Report disclosing the first nine accounts at Riggs-Washington D.C. was published. Accordingly, this action was filed well within the five year limitations period.

PNC cites Florida Statute § 95.031(1), the general statute of limitations, to try to bolster its argument that the limitations period began to run when Riggs closed the last Pinochet account. The argument is unavailing for four reasons. First, the general statute of limitations does not apply, because Florida RICO carries its own specific statute of limitations, § 772.17. That statute specifically provides:

> <u>Notwithstanding any other provision of law,</u> a civil action or proceeding under this chapter may be commenced at any time within 5 years after the conduct in violation of a provision of this act terminates or the cause of action accrues. If a criminal prosecution or civil action or other proceeding is brought or intervened in by the state or by the United States to punish, prevent, or restrain any criminal activity or criminal conduct which forms the basis for a civil action under this chapter, the running of the period of limitations prescribed by this section shall be suspended during the pendency of such prosecution, action, or proceeding and for 2 years following its termination.

---

[2] PNC will undoubtedly argue that *Jones v. Childers* is no longer good law, following *Davis v. Monahan.* That argument is unavailing. *Davis* did not address the statutory claims at issue here, and the 11th Circuit decision applying the injury discovery rule remains binding precedent.

Fla. Stat. §772.17 (emphasis supplied).   Accordingly, by virtue of including the language "notwithstanding any other provision of the law," §772.17 precludes reference to the general statute of limitations in Chapter 95 or any case law construing limitations periods governed by the statute to the extent those cases are contrary to the operation of §772.17.

Second, this provision establishes two separate times for the five year period to begin to run: after the conduct in violation of the RICO act terminates, or the cause of action accrues. Here, the motion to dismiss does not (and cannot) establish when the conduct at issue terminated.[3]  Moreover, as set forth below, the cause of action accrued, at the earliest, when the Republic of Chile discovered its injury, i.e., at the latest, on July 15, 2004, the date of the Senate Report.

Third, even if the definition contained in § 95.031(1) were applied here, and the five year limitations period began to run "when the last element constituting the cause of action occur[ed]," the last element here was the discovery of the injury, i.e., when the Republic of Chile discovered that the money laundered by Pinochet through ESB was no longer available to be frozen, not when Riggs ceased acting as Pinochet's banker.  Fourth, even if the general statute of limitations were applied, § 95.031(2) (1) establishes a discovery rule.  While as previously stated, the Court should not look to this general statute of limitations to determine when the limitations period begins to run on a claim under Florida RICO, if the Court were to apply it, it would also apply the fraud discovery rule to determine when the Republic of Chile discovered or should have discovered "the facts giving rise to the cause of action," i.e., the injury *and pattern* giving rise to a RICO claim.  Riggs does not and could not argue that the Republic of Chile knew

---

[3] The Second Amended Complaint alleges transactions that amounted to RICO violations occurring in 2002.  Given the tolling of the limitations period during the pendency of a criminal proceeding against Riggs plus two years after it concluded, those transactions occurred within the limitations period, the statute did not run.

or should have known of the injury and pattern more than five years before filing this complaint.

Rather, it is undisputed that the Republic of Chile did not and could not have learned of the

specific violations and the pattern until the publication of the 2004 Senate Report. Accordingly,

under the injury discovery rule established by the Federal RICO cases, as well as under the

Florida general statute of limitations, this action was brought well within the five year limitations

period.

          *1.     The Limitation Period has been tolled.*

The date of the last act is <u>not</u> the sole basis for determining when a cause of action for

RICO, under Florida law, accrues.[4]  First, as explained above, the injury discovery rule is used to

determine when a RICO cause of action has accrued.  Second, the statute of limitations based on

Fla. Stat. §772.17 is tolled when a criminal proceeding is initiated based on criminal conduct that

forms the basis of the civil RICO statute. *See, Ziccardi v. Strother*, 570 So.2d 1319 (Fla. 2d DCA

1990) (finding that a civil claim for violation of Florida RICO was not barred because the statute

of limitations was tolled pursuant to Fla. Stat. §772.17 during the criminal prosecution of the

defendant and for two years thereafter).  The statute states, in relevant part:

> . . . <u>the running of the period of limitations prescribed by this
> section **shall be suspended** during the pendency of such
> prosecution, action, or proceeding and for 2 years following its
> termination</u>.

Fla. Stat. §772.17 (emphasis supplied).  PNC studiously ignores this portion of the statute, which

suspends the running of the limitations during a proceeding and two years after it terminates.  On

January 26, 2005 the United States filed an information against Riggs in the criminal case 1:05-

cr-00035-RMU-1, in the U.S. District Court for the District of Columbia.[5]  Riggs entered a guilty

---

[4] Even if it were, the last acts alleged have occurred within the limitations period, as tolled.

[5] The Republic of Chile hereby requests that this Court take judicial notice of the criminal
proceedings against Riggs Bank in *USA v. Riggs National Bank*, Case No. 1:05-cr-00035-RMU

plea on January 27, 2005 and final judgment was entered on March 31, 2005. During the pendency of this action, the statute of limitations was suspended. When the action terminated, the limitations period remained suspended for two additional years. Therefore, the statute of limitation would only run if the conduct at issue ceased, or the cause of action accrued, more than seven years and two months prior to filing this lawsuit. Thus, even if this court were to accept PNC's accrual standard, the case was brought within the limitations period. For purposes of this argument, even if the "last act" terminating the racketeering activity by Riggs was the date on which the final Pinochet accounts were closed, August 2002, the statute of limitations for the action expires in October 2009. Clearly, PNC's argument that the statute of limitations bars this action is untenable and the motion must be denied.

> 2.    *Assuming, arguendo, that the injury discovery rule does not apply, the action is still timely pursuant to the Delayed Discovery Doctrine.*

Generally, a cause of action accrues when the time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues. Fla. Stat. §95.031. A cause of action accrues when the last element constituting the cause of action occurs. *Id.* An action based on fraud, however, accrues from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence. Fla. Stat. §95.031(2) (a). Similarly, actions for products liability also accrue from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence. Fla. Stat. §95.031(2) (b). This is known as the delayed discovery doctrine. It generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortuous act giving rise to the cause of action. *Hillsborough*

---

(D.C. Cir.). A plaintiff need not anticipate an affirmative defense in its initial pleading and as such the Republic of Chile was not required to plead the existence of the criminal proceeding against Riggs and its resulting suspension of the limitations period.

*Community Mental Health Ctr. v. Harr*, 618 So. 2d 187, 189 (Fla. 1993).  The delayed discovery doctrine applies to the accrual of a cause of action and does not toll the statute of limitations. *Hearndon v. Graham*, 767 So. 2d 1179, 1184-1185 (Fla. 2000).  The doctrine has also been applied to causes of actions not included by the legislature in §95.031 such as medical malpractice, professional malpractice and intentional torts based on abuse.  *See* Fla. Stat. §§95.11(4) (a) and (b), 95.11(7).

While the Florida Supreme Court has receded from its past decisions that applied the delayed discovery doctrine to *toll* the running of a statute of limitation, the Florida Statutes do NOT impede the delay of the *accrual* of a cause of action. *Hearndon* at 1185.  The doctrine is intended for "those cases where the plaintiff cannot readily discover the injury done to him." *Carter v. Lowe's Home Centers, Inc., 954 So.2d 734, 735 (Fla. 1st DCA 2007).*  Or where the Court found that the defendant's wrongful conduct resulted in the delay in filing suit. *See Hearndon* at 1185-1186; *Davis v. Monahan*, 832 So. 2d 708, 710-712 (Fla. 2002).  PNC argues that Florida does not recognize the delayed discovery rule for the types of state law claims alleged here.  Citing to a decision that was based on a civil theft claim, and not Florida RICO, PNC states that the discovery of state claims cannot be equitably tolled. *Motion to Dismiss* at pp. 8-9.  *Davis v. Monahan*, however, is distinguishable.  832 So. 2d 708 (Fla. 2002).  The Florida Supreme Court in *Davis* found that in Florida a cause of action begins to run when the last element of the cause of action occurs. *Id*. at 710; Fla. Stat. § 95.031.  The court further stated that "an exception is made for claims of fraud . . ." *Id*.; Fla. Stat. § 95.051(2)(a).  The claim in *Davis* was not based on fraud.  Here, the Second Amended Complaint specifically alleges fraud and concealment by the Defendants.

### 3.   *This Court **should** apply the doctrine of delayed discovery*

This Court should apply the doctrine of delayed discovery to the instant action for two

compelling reasons:

1.   The actions of Riggs that resulted in the injuries to the Republic of Chile, and the filing of this action, are all either based on fraud (mail and wire fraud) or were done to perpetrate a fraud (money laundering and travel act violations); and

2.   Riggs took deliberate steps both to conceal the Pinochet accounts from the world and to conceal its involvement and management of those accounts such that the Republic of Chile could not have known that any of the elements constituting a RICO violation had occurred prior to July 15, 2004.

It is clear from Fla. Stat. § 95.031(2)(a) that an action founded upon fraud accrues when

the facts giving rise to the cause of action were discovered or should have been discovered with

the exercise of due diligence.  A defendant violates RICO in Florida when he commits two or

more of the predicate acts delineated in Chapter 772.  In other words, a defendant does not

"commit a RICO," but rather a defendant commits two or more acts, such as money laundering

or wire fraud, in violation of RICO.  The predicate acts alleged in the Second Amended

Complaint detail a classic money laundering scheme created to perpetrate a fraud- theft of

government funds by fraudulently concealing the transfers of those funds and the ultimate

recipient of those funds.  Moreover, the predicate acts themselves prevented the Republic of

Chile from discovering the cause of action prior to the publication of the 2004 Senate Report.

For example, the personal accounts held by Pinochet at Riggs used an alias to conceal the true

owner of the accounts that received illegal transfers of funds from the Casa Militar and

Secretario Privado accounts.

The ultimate purpose of a money laundering enterprise is to defraud regulators and

victims from discovering the true identity and source of the funds being laundered.  This is a

fraud in the classic sense.

It cannot be said enough: Riggs continued to conceal the activities of the Pinochet Enterprise for years after the Pinochet accounts were closed, thus continuing the enterprise's operation.   Riggs never disclosed to regulators the existence of the accounts and the transfers that had occurred.  Even after the United States Senate conducted its initial investigation into the Bank, Riggs did not come clean.  A subsequent investigation (leading to the publication of the Supplemental Senate Report in 2005) revealed many more Pinochet accounts that Riggs did not disclose in 2004.

PNC argues that the delayed discovery doctrine can only be applied to the specific actions listed at Fla. Stat. §§ 95.031, 95.11 and to childhood sexual abuse actions as announced by the Florida Supreme Court in *Hearndon*.  Notably absent from the litany of case law where the court declined to apply the doctrine is any case based on RICO or money laundering.  The cases relied on by PNC to support the limitation of the delayed discovery doctrine indicate that an element of fraud was absent from the allegations presented by the delayed plaintiff.  For example, the Court in *Davis* reviewed the various district court decisions that had analyzed whether the doctrine should be extended beyond the statutory confines.  In those cases, the Court found that either an allegation of fraud or deliberate wrongful acts by the defendant to prevent the discovery were absent.  The *Davis* Court in refusing to extend the doctrine beyond *Hearndon* specifically found that the plaintiff "did not allege fraud" and "there was no specific allegation that [the defendants] actions caused [plaintiff's] delayed discovery."  *Davis* at 712.

This Court should find that the delayed discovery doctrine applies to this case and that the Republic of Chile's causes of action did not accrue until they discovered or should have discovered that the cause of action occurred.  Here, the complaint alleges that the Republic of Chile discovered its cause of action against Riggs on July 15, 2004.  The Second Amended

Complaint details the deliberate acts of fraudulent concealment committed by Riggs to prevent any person or entity from discovering the acts of the Enterprise.  The Republic of Chile could not have, even with the exercise of reasonable due diligence, discovered the occurrence of the predicate acts that make up the instant cause of action as a result of the deliberate acts of Riggs to fraudulently conceal the activities.

      4.    *Statute of limitations is an affirmative defense that is inappropriate for a motion to dismiss*

The statute of limitations is an affirmative defenses which should be raised by answer rather than by a motion to dismiss the complaint; and only in extraordinary circumstances where the facts constituting the defense affirmatively appear on the face of the complaint and establish <u>*conclusively*</u> that the statute of limitations bars the action as a matter of law, should a motion to dismiss on this ground be granted. *Rigby v. Liles,* 505 So.2d 598, 601 (Fla. 1st DCA 1987) (emphasis added; citations omitted); *see also Levine v. Levine,* 734 So.2d 1191, 1195 (Fla. 2d DCA 1999); *Brickell Biscayne Corp. v. Morse/Diesel, Inc,* 683 So. 2d 168, 169 (Fla. 3d DCA 1996).  Furthermore, a complaint is not required to anticipate affirmative defenses. *Conte v. R & A Food Services, Inc.,* 644 So.2d 133, 133 (Fla. 2d DCA 1994).

PNC has not shown that the Second Amended Complaint conclusively establishes that the conduct in violation of the RICO statute ceased, or that the cause of action accrued, more than seven years and two months prior to the filing of this action.  Moreover, the allegations of the Second Amended Complaint make it clear that Riggs actively concealed its wrongdoing such that the Republic of Chile did not discover its injury until July 2004.  PNC's failure to identify in their motion the date on which the cause of action allegedly accrued is fatal to the argument here.  A motion to dismiss based on a statute of limitations defense requires that the facts constituting the defense affirmatively appear <u>on the face of the complaint</u>.  Based on PNC's own statements,

the Republic of Chile does not specify a "last act" in the Second Amended Complaint. *See* Motion to Dismiss at p. 3. Consequently, PNC cannot argue that the expiration of the statute of limitations is established on the face of the complaint. The statute of limitations is therefore not established in the motion to dismiss.

In addition, in its prior motion to dismiss, PNC never raised the statute of limitations with respect to the Florida RICO Claims. In fact, PNC has previously recognized and argued to this Court that the limitations period for both the federal and state law claim began to run from the date of the publication of the 2004 Senate Report- July 15, 2004. PNC described at length in its earlier motion to dismiss the "storm warnings" available to the Republic of Chile as of the publication of the 2004 Senate Report. *See* Motion to Dismiss Amended Complaint at pp. 3-9 [D.E. 23]. PNC argued that "[b]eyond pretending that the 2004 report did not say what it clearly said, that position would also create a rule eviscerating any limitations period in fraud cases, because the statute would not start to run until the alleged fraud victim knew every last detail of the scheme." *Id.* at p. 8. PNC is now seeking to eviscerate the rule it had previously so vigorously defended. Further, PNC made it clear that the Florida RICO claims were subject to a longer statute of limitations period. Tellingly, the Bank did not argue that the state law claims were time-barred.

### C. THE SECOND AMENDED COMPLAINT PROPERLY ALLEGES VIOLATIONS OF RICO

The four elements of a RICO claim are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The Motion to Dismiss challenges only the conduct element and incorrectly claims that the allegations do not meet the "operation and management test" required by *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163 (1993).

        *1.*      *The allegations meet the "operation and management" test.*

PNC's argument that the allegations of the Second Amended Complaint and the Civil RICO Statement do not sufficiently state that the Bank conducted or participated in the enterprise's affairs is untenable.  As required by the Supreme Court in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163 (1993), the Second Amended Complaint alleges that the Bank directed many, if not all, of the predicate acts alleged.  For example, between1981 to 2004, eight Riggs accounts opened in the names of Chilean military officers served as conduits for the transfer of Reserved Funds and transmitted more than $1.7 million to Pinochet related accounts. *See, Second Amended Complaint at* ¶¶ 62-66.  During the course of 28 years, Riggs and its officers took deliberate steps to conceal the misappropriation and money laundering scheme of the Pinochet Enterprise and directly participated in both the misappropriation and the subsequent laundering of government funds. The Second Amended Complaint alleges that Riggs and its officers had complete knowledge of the sources of Pinochet's income, including income derived from the Reserved Funds.  Despite this full knowledge, Riggs intentionally avoided listing the full extent of Pinochet's income sources.  Instead, the few "Know Your Customer" forms that were created for the Pinochet personal and corporate accounts are incomplete and list government pensions, his salary as a public servant and "family business" as the sources of income for the sole purpose of directing and participating in the concealment goals of the enterprise in furtherance of the money laundering scheme.  RICO liability is not limited to those with primary responsibility for the enterprise's affairs, with formal positions in the enterprise or with significant control over or within the enterprise. *Reves* at 179.

Riggs served as a long-standing personal banker for Pinochet and actively and knowingly assisted him in the concealment and movement of funds derived from specified unlawful

activity. *See RICO Case Statement* at p. 4.  Moreover, senior Riggs officials had extensive

business and personal relationships and interactions with Pinochet.  Riggs accepted millions of

dollars in deposits from Pinochet and the Pinochet-controlled accounts without any inquiry into

the source of these funds.  Interestingly, PNC cites to only a few of the allegations in the Second

Amended Complaint as "insufficient" evidence of conduct.  PNC, however, specifically omits

the following racketeering conduct stated in the Second Amended Complaint and the RICO Case

Statement establishing that Riggs directed or participated within the meaning of the *Reves*

"operation or management" test:

- Riggs engaged in the predicate act of money laundering when it authorized numerous transfers of Reserved Funds to personal Pinochet accounts and other Pinochet-controlled accounts both at Riggs and other financial institutions worldwide.  Riggs knew that the transferred funds were Chilean government funds.  *Second Amended Complaint* at ¶ 37.

- Monies from these accounts were transferred out of Riggs Bank into other Pinochet-controlled accounts at various U.S. and international banks.  *Id.* at ¶ 39.

- Bank records demonstrate that on at least nine occasions from 1990 to 1996, checks or wire transfers moved a total of approximately $650,000 from the Reserved Funds accounts at Riggs Miami to Pinochet's accounts at other financial institutions.  *Id.* at ¶ 40.

- The bank documents transferring these funds used a disguised variant of Pinochet's name or the name of his personal assistant, Mónica Ananias Kuncar, as the designated recipient of the funds.  *Id.* at ¶ 41.

- Riggs also engaged in money laundering when it assisted Pinochet in creating off-shore companies and bank accounts, and in accepting transfers of illicit funds from these off-shore companies.  *Id.* at ¶ 42.

- Riggs also committed numerous acts of mail and wire fraud in furtherance of the Pinochet Enterprise's twin goals of money laundering and concealment of misappropriated funds.  *Id.* at ¶ 43.

- Riggs engaged in various acts of wire fraud, including:
  - $303,000 was wire transferred to the Daniel Lopez[6] account in December 1993 from Banco de Chile accounts in Chile.
  - $15,000 was wire transferred to the Daniel Lopez account in January 1994 from Banco de Chile accounts in Chile.
  - $40,000 was wire transferred to the Daniel Lopez account in January 1994 from Banco de Chile accounts in Chile.

---

[6] Daniel Lopez is an alias used by Pinochet.

- o $250,000 was wire transferred to the Daniel Lopez account in July 1994 from "M. Hiriart" accounts at Banco Atlantico.
- o $627,000 was wire transferred to the Daniel Lopez account in November 1994 from "M. Hiriart" accounts at Banco Atlantico.
- o $627,000 was wire transferred from the Daniel Lopez account to Pinochet's Account No. 76750393 in Washington D.C. in January 1996.
- o March 23, 1999 facsimile correspondence between Riggs account manager and Pinochet requesting Pinochet's signature in order to transfer funds ("el grande") from London to the Washington account.

*Id.* at ¶ 44.

- Riggs engaged in various acts of mail fraud in order to assist the Pinochet Enterprise in their money laundering scheme. The acts of mail fraud include:
  - o May 15, 2001 Riggs sent ten sequentially numbered cashiers' checks to Pinochet through the mail.
  - o October 11, 2001 sent another ten sequentially numbered cashiers checks to Pinochet through the mail.

*Id.* at ¶ 45.

- Riggs engaged in foreign travel in aid of a racketeering enterprise. Over the course of 25 (twenty-five) years, Riggs executives travelled to Chile on a regular basis in order to assist the Pinochet Enterprise. These travel act violations include:
  - o August 1986 a Riggs delegation, including bank chairman Joseph Allbritton traveled to Santiago, Chile to meet with Pinochet.
  - o October 1994 Riggs President Timothy C. Coughlin led a Riggs delegation to visit Pinochet in Chile and was accompanied by Paul Cushman III and Carol Thompson. During this visit, Riggs officials intentionally and actively solicited Pinochet's personal banking business and the business of his military officers.
  - o October 27, 1997 a delegation of Riggs senior official, including Mr. Allbritton, and senior official of the bank's private international banking and embassy divisions, visited Pinochet in Chile. Immediately prior to this trip, Riggs made a donation to the Augusto Pinochet Ugarte Foundation.
  - o March 1998 Carol Thompson and Timothy Coughlin again traveled to Chile to meet with Pinochet.
  - o June-July 1998 Carol Thompson traveled to Chile to meet with Pinochet. A hold mail signature card was completed during this visit.
  - o March 2000 Carol Thompson traveled to Chile to meet with Pinochet following his return from the United Kingdom after an 18 month detention there.
  - o August 2000 a Riggs private banker traveled to Chile to deliver four cashiers checks to Pinochet.
  - o May 2001 a Riggs private banker again traveled to Chile to deliver ten cashiers checks to Pinochet.

*Id.* at ¶ 46.

- Riggs, as a legitimate financial institution, was essential to the operation and management of the Enterprise in assisting in the misappropriation, laundering and concealment of the funds. As set forth more fully in the paragraphs that follow, Riggs participated directly and indirectly in the conduct of the Enterprise's affairs. *Id.* at ¶ 47.

- Although it has not yet been determined exactly when Pinochet began diverting monies for his personal gain from the Chilean national treasury, it is known that as early as July 1979, Pinochet opened an account using the alias "Jose Ugarte" at Riggs Bank in Washington, D.C. ("Riggs Bank-Washington"). In fact, during the period from July 1979 through March 1996, Pinochet had a total of seven bank accounts at Riggs Bank-Washington and Riggs Bank in Miami, Florida ("Riggs Bank-Miami") under the name of one of his aliases. *Id.* at ¶ 48.

- Pinochet also opened three accounts under the names of two off-shore shell companies that were established for him by a Riggs Bank affiliate: Ashburton Company, Ltd. ("Ashburton") and Althorp Investment Company, Ltd. ("Althorp"). *Id.* at ¶ 49.

- Additionally, during the period from November 23, 1981 through April 29, 2004, nine accounts were opened at Riggs Bank in Miami in the names of high-ranking Chilean military officials or others who were linked to Pinochet- the Casa Militar and Secretario Privado accounts. Despite the fact that these "military officer accounts" held what bank personnel believed to be official funds of the Chilean government, numerous withdrawals were documented from these accounts into personal bank accounts belonging or linked to Pinochet. The transfer of funds out of an official government bank account into the personal bank account of a third party is a transfer of illicit funds. *Id.* at ¶ 50.

- For example, on March 1, 1996, a check in the amount of $287,000.00 was issued from the Riggs Bank-Miami Secretario Privado account in the name of Chilean Colonel Juan Ricardo Mac Lean Vergara to Mónica Ananias (a/k/a Mónica Ananias Kuncar), Pinochet's personal assistant. *Id.* at ¶ 51.

- The $287,000.00 check issued to Pinochet's personal assistant was apparently used to purchase four separate cashiers checks totaling $287,000.00 from Banco de Chile. Two of the cashiers checks were made payable to "J. Pinochet" and two were made payable to "M.L. Hiriart" (an alias used by Pinochet's wife). These cashiers' checks were then deposited into Pinochet and his wife's personal money market account at Riggs Bank on March 1, 1996. All of these transactions (which had no legitimate purpose) took place on the same day - March 1, 1996. *Id.* at ¶ 52.

- With the active complicity and assistance of Riggs, Pinochet opened ten personal accounts at Riggs during the relevant time period: three (3) in the name the name of Augusto Pinochet Ugarte and his wife, four (4) in the name of a disguised variant of his name and three (3) in the name of an alias. *Id.* at ¶ 53.

- After facilitating the incorporation of the off-shore shell companies, Riggs also opened accounts and certificates of deposits in the names of Ashburton and Althorp. None of these served a legitimate business purpose, but rather were used solely as additional conduits through which Pinochet laundered money. *Id.* at ¶ 55.

- Between 1981 and 2004, Riggs opened at least nine accounts in the names of various Chilean military officers and the alias of one of these, in Miami. These accounts held government monies misappropriated by Pinochet for his personal use. With the active

complicity, assistance and facilitation by Riggs, these military officer accounts served as direct conduits for the funneling and laundering of Pinochet funds.  *Id.* at ¶ 62.

- Riggs officials were well aware of how these military officer accounts were being used.  *Id.* at ¶ 63.

- Internal Riggs correspondence has revealed that these officers were considered "front-men of General Pinochet."   *Id.* at ¶ 64.

- At least $1.774 million was laundered through these accounts to other Pinochet-controlled accounts.  *Id.* at ¶ 65.

- Further, Riggs' willful and knowing failure to follow basic banking regulations governing money laundering and other suspicious transactions establishes their direct management of the money laundering enterprise.  *Id.* at ¶ 71.

- Riggs secretly transferred $1.6 million from its London branch to the United States while Pinochet was under house arrest in the United Kingdom.  To accomplish this evasive transaction, on March 23, 1999 a Riggs bank officer spoke with Pinochet and then asked him, via facsimile, to provide a signature.  The Riggs bank officer specifically asked Pinochet to sign the facsimile in order to move "el grande" from London to Washington D.C.  *RICO Case Statement* at p. 5.

- [Twenty cashier's checks delivered to Pinochet in Chile by a bank officer] were drawn from Riggs Bank's own "concentration account," and not from any of the Pinochet Accounts.  A "concentration account" is an account used by a bank for administrative purposes, which often commingles funds from various sources prior to transfer to specific accounts.  A concentration account is not designed to be used by a client for his or her own transaction.  The use of Riggs Bank's concentration account to issue the . . . cashier's checks would hinder any attempt to trace the source of the cashier's checks to the Pinochet Accounts.  *Id.* at p. 7

It is clear from the well-pled allegations of the Second Amended Complaint, as well as the RICO Case Statement, that this is not a case of bankers acting like bankers, i.e., a mere receipt of funds case.  Riggs and its officers famously operated and managed the money laundering scheme and the concealment of the funds from the Republic of Chile through the predicate acts of wire fraud, mail fraud, foreign travel in aid of racketeering, false use of passport and fraud in connection with the use of identification documents.  Those acts were done by Riggs itself.  The Bank was the essential player that committed the predicate acts alleged in the

Second Amended Complaint, and therefore, the conduct element has been met.  Bankers do not become racketeers by acting like bankers.  Bankers become racketeers by laundering money.

>    2.    *The Second Amended Complaint satisfies the "direct injury" requirement for RICO standing.*

The Republic of Chile has been directly injured by the predicate acts committed by Riggs when the Bank transferred funds out of government accounts (the initial theft) and into personal and corporate accounts held by or for the benefit of Pinochet both at Riggs and at other financial institutions.  The Republic of Chile was further injured through the long-running and now well-documented acts of Riggs in laundering of the stolen government funds.  The predicate acts, taken together, form the pattern of racketeering activity in furtherance of the enterprise.  These predicate acts directly and proximately caused the injury to the Republic of Chile.  The Second Amended Complaint alleges that the Republic of Chile was directly injured "by the actions of Riggs in its business and property both through the Bank's commission of predicate acts . . . as well as in its conspiracy with Pinochet, and others acting in concert with him."  *Second Amended Complaint* at ¶ 15.  The Republic of Chile was injured by the actions of Riggs in its operation, management and active assistance in the misappropriation and laundering of funds from the Reserved Funds held at Riggs that were transferred directly to Pinochet-controlled accounts worldwide.  *Id.* at ¶ 16.  Additionally, the Republic of Chile was injured by the actions of Riggs in its money laundering, travel act violations, and acts of mail and wire fraud. These overt acts by Riggs allowed Pinochet to continue successfully for many years misappropriating and concealing government funds and other illegally obtained monies both at Riggs and other banks throughout, and even after, the time that Riggs served as Pinochet's private banker and co-conspirator.  Riggs caused the injury by actively allowing the transfer of Reserved Funds and by actively concealing the existence of the misappropriated and laundered funds.  *Id.* at ¶ 16.

RICO allows recovery for persons who are injured in their "business or property by reason of a violation of" the RICO statute. 18 U.S.C. § 1964(c). The Republic of Chile has broader business interests than ordinary persons. Its business includes the protection of its citizens' rights and the money in its treasury. While the Republic of Chile suffered injury here to its property through the theft of government "Reserved Funds," its injury is broader. The long-running money laundering scheme allowed a Chilean official, Pinochet, to hide his ill gotten gains and put them beyond the reach of the Republic of Chile. The actions of Riggs establish injury to the business of the Republic of Chile, even beyond the initial theft of government funds.

Additionally, but for Riggs' commission of money laundering, mail fraud, wire fraud and foreign travel in aid of racketeering over the course of 28 years, as well as conspiring with Pinochet to commit those RICO acts, the Republic of Chile would have been able to identify and recover almost $11 taken by Pinochet. PNC appears to misunderstand the injury for which the Republic of Chile seeks redress. The injury is both the initial theft when the Bank authorized and effectuated the transfer of funds out of the Casa Militar and Secretario Privado Accounts and the subsequent laundering of those government funds through personal and corporate accounts held by of for the benefit of Pinochet. PNC tries to sum up this case in its Motion, p. 23, thus: "Chile's loss is that 'millions of dollars [were] misappropriated from the Chilean national treasury' . . .. The direct cause of this alleged injury is Pinochet's 'misappropriation' (whatever that is) not what allegedly happened to the money later, after it was deposited at Riggs Bank." The Second Amended Complaint makes detailed allegations that Riggs took extensive, direct actions that both allowed Pinochet to misappropriate the funds in the first instance, and helped Pinochet launder the misappropriated funds. The Casa Militar and Secretario Privado accounts held at Riggs contained government funds. As explained in the Second Amended Complaint and

20

the RICO Case Statement, Riggs was well aware of the fact that those accounts contained funds that belonged to the Republic of Chile.  It was the *laundering* and transfer of those funds that prevented detection and prevented the Government of Chile from recovering the funds.  The allegation of numerous predicate acts committed by Riggs in order to conceal the theft, particularly money laundering, clearly establishes the causation of injury in the loss of the funds themselves and the subsequent inability to recover the funds.

The Republic of Chile is not asserting third party rights of recovery nor is it one step removed from the injury. *See Feingold v. Budner*, 2008 WL 4610031 *2 (S.D. Fla. 2008) (granting a motion to dismiss a claim under §1964(c) where the plaintiff failed to allege that the fraudulent statements at issue led directly to his injury and there was no direct chain of causation obvious from the allegations in the complaint); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456-461, 126 S.Ct. 1991 (2006) (finding that the plaintiff was unable to maintain a claim under §1962 (c) against a competing business where the complaint alleged that the defendant failed to charge sales tax and had submitted fraudulent tax returns; the alleged predicate acts did not have a causal connection with the alleged injury to the plaintiff's business); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S. Ct. 1311 (1992) (holding that the plaintiff who brought action on behalf of the defendant's customers could not maintain a claim for RICO against a broker-dealer where the link between the cause of the injury and the injury itself was too remote to satisfy the proximate cause requirement).  Each of the cases PNC relies on to establish lack of a direct injury is thus inapposite.  The purported plaintiff in each of those cases was at least one step removed from the actual injury or was seeking to assert rights that actually belonged to another.  The predicate acts committed by Riggs were done to conceal the source and beneficiary of funds that were laundered through its accounts.  The purpose was to conceal.

21

The object of that concealment was the Republic of Chile.  That injury to the Republic of Chile was proximately caused by Riggs.

Unlike the plaintiff in *Vicon Fiber Optics Corp. v. Scrivo*, the injury here could NOT have occurred without the conduct and participation of Riggs when it committed the predicate acts of money laundering, wire fraud, mail fraud and foreign travel in aid of racketeering.  But for the movement of funds out of the Casa Militar and Secretario Privado accounts (and their subsequent laundering through numerous other accounts), the Republic of Chile would not have been injured.

PNC's reliance on *Oki Semiconductor v. Wells Fargo Bank* is misplaced.  In that case, the monies laundered through the defendant bank were the proceeds from the theft *and subsequent sale of tangible goods*.  *Oki Semiconductor*, 298 F. 3d 768, 771 (9th Cir. 2002).  Here, the theft/misappropriation and the laundering occurred, essentially, simultaneous each time that any amount of funds was transferred out of a Casa Militar or Secretario Privado account and into a non-governmental account.  Both the initial theft, with Riggs' knowing participation, and the subsequent laundering of the same funds, directly injured the Republic of Chile.

> 3.     *Count II properly states a claim for Conspiracy.*

The claim for conspiracy to commit a RICO violation is also properly pled.  The underlying violations are sufficiently and properly alleged as previously explained.  Moreover, the allegations go beyond merely stating that Riggs conspired with the Pinochet enterprise. Each of the factual allegations incorporated into Count II provides evidence of a conspiracy between Riggs and the Pinochet Enterprise.

The Courts have found that an express agreement is not necessary to establish a conspiracy: a tacit agreement or mutual understanding will establish a conspiracy.  *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009); *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir.

2008).  Circumstantial evidence can establish a conspiracy.  S*ee, Hunt* at 647 (affirming a conspiracy conviction based on circumstantial evidence of an agreement to defraud).  The factual circumstances, taken together, may provide an inference that a conspiracy occurred.  *See, United States v. Poulsen*, 2009 WL 1604975 (S.D. Ohio 2209) (finding that jury could have reasonably inferred that defendant participated in the conspiracy based on the totality of the acts committed by the defendant).  The factual allegations and the predicate acts committed by Riggs properly suggest and provide a reasonable inference that the bank was in agreement with the enterprise to conceal the source and beneficiary of the Pinochet accounts.  This agreement can be inferred from, among other acts by the Bank,  the use of aliases to conceal the actual account beneficiary, the use of offshore corporations and third party accounts to hold and launder the Pinochet funds and by travelling to Chile to hand-deliver cashier's checks.

> 4.    *Count III properly states a claim for Aiding and Abetting.*

The claim for aiding and abetting a RICO violation is also properly pled.  Contrary to PNC's contention, adding and abetting a violation of RICO is still recognized in this circuit.  In *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994), the Court affirmed a denial of summary judgment and found that one who aids and abets two predicate acts can be civilly liable under RICO.  The Court went on to explain that to establish aiding and abetting liability a plaintiff must show:

> (1)    that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and
> (2)    that the defendant knowingly and substantially assisted the principal violation.

*Id*.  The well-pled allegations of the Second Amended Complaint, combined with the RICO Statement, establish a sufficient claim that PNC aided and abetted a violation of 18 U.S.C. § 1962.

PNC argues that *Cox* has been overruled by *Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994). Following the *Central Bank* decision, this Court had an opportunity to revisit the issue of whether one can maintain a claim for aiding and abetting a RICO violation. *In re: Managed Care Litigation*, 135 F.Supp.2d 1253, 1267 (S.D. Fla. 2001). This Court (Judge Moreno) found that it was bound to follow Eleventh Circuit precedent and permitted a cause of action for aiding and abetting to go forward, specifically noting that the Supreme Court denied certiorari in *Cox*, more than one year after its decision in *Central Bank. Id.* Accordingly, aiding and abetting continues to be a viable cause of action in this circuit and the Second Amended Complaint properly alleges that Riggs aided and abetted the Pinochet Enterprise to commit numerous violations of RICO.

## III.    CONCLUSION

Based on the foregoing, the Republic of Chile respectfully requests that this Court deny PNC's Motion to Dismiss the Second Amended Complaint.

Dated: November 6, 2009.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Attorneys for Plaintiff Consejo de Defensa del Estado de la Republica de Chile*
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131-2336
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

By:____/s/ Melissa R. Alvarez_____
     **William K. Hill, Esq.**
     Florida Bar No. 747180
     **Melissa R. Alvarez**
     Florida Bar No. 0820091

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached service list via transmission of notices of electronic filing generated by CM/ECF.

By: _____ */s/ Melissa R. Alvarez*
Melissa R. Alvarez

CASE NO. 09-20612 CIV-GOLD/MCALILEY

## <u>SERVICE LIST</u>

Michael R. Tein, Esq.
Florida Bar No. 993522
tein@lewistein.com
Guy A. Lewis
Florida Bar No. 623740
lewis@lewistein.com
Lewis Tein, PL
The Offices at Cocowalk
3059 Grand Avenue, Suite 340
Coconut Grove, Florida 33133